UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cr-86-PPS |
| | ) | |
| AKEEM JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

On July 19, 2018, defendant Akeem Jackson was indicted on charges of violating the Hobbs Act and possession of a firearm in furtherance of a robbery. [DE 9.] The charges stem from the robbery of a Brinks armored truck outside of a Chase Bank in Hammond, Indiana. The charges resulted from incriminating evidence found during a warrantless search of Jackson's home. The search was the result of what has come to be known in law enforcement parlance as a "knock and talk." [DE 5.] Jackson has filed a motion to suppress [DE 24], contending that physical evidence seized from his residence, and his statements he made to law enforcement during his interrogation were obtained unconstitutionally. Jackson tells me that any consent to search he gave during the "knock and talk" was involuntary under the circumstances, and that his later statements to police were made without a knowing waiver of his rights.

While I think some of the police conduct in this case was questionable as it relates to the consent to search received from Jackson, I need not address that issue

because Lillie Banks, Jackson's grandmother and the lessee of the apartment in which Jackson resided, consented to the search of her entire apartment immediately after Jackson's narrower and challenged consent to the search of his bedroom. Furthermore, it is apparent to me from the video evidence, that defendant Jackson knowingly and voluntarily waived his *Miranda* rights prior to being questioned at the police station. For that reason, his statements to police will not be suppressed either. Accordingly, I will deny the motion in full.

## Factual Background

The factual record related to this motion has been significantly developed. On February 6, 2019, I held the first evidentiary hearing. [DE 35.] At that hearing, I heard testimony from FBI Agent Chad Oakes, Captain Zeke Hinojosa of the Hammond Police Department, Detective Dan Bates of the Hammond Police Department, FBI Investigator Michael Peasley, and the defendant Akeem Jackson. In addition, audio recordings of law enforcement's conversations with Jackson in his home, as well as their ride from his home in Chicago to the police station in Hammond, Indiana were entered into evidence. There is also a videotape of Jackson's interrogation by law enforcement at the police station. At two supplemental evidentiary hearings, I heard additional testimony from the officers who performed the search of the apartment, one of the officers who spoke with Jackson's mother and grandmother in person later in the day, additional testimony from FBI Agent Chad Oakes concerning his telephone conversations with Jackson's grandmother Lillie Banks, Lillie Banks herself, and from Jackson's mother Tajuana

Banks. Based upon all this evidence, I make the following factual findings concerning the day's events. To the extent testimony or evidence is in conflict, it is noted below and resolved in the discussion section of the opinion as necessary.

Sometime after 8:00 am, on the morning of June 27, 2018, a crew of federal and local law enforcement descended upon an apartment building on the south side of Chicago. They were there pursuing a lead in an armed robbery of a Brinks truck which took place three months prior here in Hammond. Specifically, investigators were interested in speaking with Akeem Jackson, who they suspected had a role in the robbery. They knew Jackson resided in the apartment with his grandmother, Lillie Banks. The officers had neither an arrest warrant nor search warrant that day. Instead, they hoped to conduct a "knock and talk" to glean information from Jackson concerning his possible involvement in the robbery. As the moniker implies, a knock and talk is a law enforcement technique whereby officers simply show up at a suspect's home, knock on the door and try to gain entry by consent so as to talk to the suspect.

As they were on the scene but prior to them approaching the apartment itself, investigators who had been conducting surveillance identified Lillie Banks leaving the apartment. Her daughter (the defendant's mother) Tajuana Banks was driving a car in which Lillie Banks was a passenger. Officers approached the vehicle and asked them if they knew Akeem Jackson. The women identified themselves, explained their relation to Jackson and told police that Jackson was in the apartment, along with his five-year old cousin, and that they were the only people present. Investigators told Lillie and

Tajuana Banks that they wanted to speak with Jackson, and the two women informed officers that they were running late to a doctor's appointment. They provided the officers with their cell phone numbers if they needed to be reached, and they went on their way. At no time during this encounter did officers ask Lillie Banks for her consent to search the apartment in which she lived with Jackson.

Shortly thereafter, at approximately 8:30 a.m., seven law enforcement officers entered the apartment building and knocked on the door of the apartment in which Akeem Jackson resided. The officers were dressed primarily in plain clothes, although it seems some were wearing FBI jackets and vests. All were armed but kept their weapons holstered but visible throughout the encounter. The apartment is a two-bedroom, one-bathroom unit, approximately 700 square feet in size in total. From the floor plan presented during the hearing, it's clear it isn't a spacious place.

The police knocked on the door and Jackson answered. They identified themselves and asked Jackson if they could come in to talk. Jackson said yes. It is unclear whether Jackson saw just one or two or the officers when he opened the door, or whether he saw the entire cavalcade congregating in the hallway. So when Jackson said yes to the officers' entry, it is unclear whether he was saying yes to *all* of them coming in or just one or two of the officers. But indeed, all seven of them accepted the invitation and the parade of officers entered and crammed their way around the small apartment. And while at least one (Agent Oakes) went in and out of the apartment to speak on the telephone at times, it seems the rest remained inside the confines of the

apartment until Jackson later departed with some of them to the police station.

Jackson testified that one officer stood near the front hallway, blocking the only exit out of the apartment. While Jackson spoke with some of the officers (primarily Captain Hinojosa), others stood watch while at least one of the officers entertained Jackson's five-year old cousin. Jackson testified that he subjectively felt he had no choice but to let them in and that he didn't feel he could tell them to leave once they were inside. He testified that while he was not physically restrained, officers followed him step-by-step as he moved throughout his home while they were there. Agent Oakes testified that while officers did not draw their weapons, several likely assumed the "superman position" by which they stood, arms akimbo, with their hand near their weapon.

After officers entered the apartment, they began to question Jackson. He was not formally placed under arrest or given *Miranda* warnings at this time. One of the first things officers asked Jackson was whether he had a firearm or weapon in the house. Jackson told them he owned a handgun, which was stored in his bedroom. He told police he legally owned the gun and bought it recently with the assistance of his mother in the hopes it would help him get a full-time job as a security guard. When police asked if they could retrieve the gun from his room, Jackson gave them permission and a few officers began searching for it. Officers had difficulty locating the gun at first but it is unclear how extensive their searching through Jackson's bedroom was at that time. When they couldn't easily locate the weapon, Jackson offered his assistance and it was

at that time Captain Hinojosa asked formally for permission to conduct a search of the apartment.

Captain Hinojosa read a consent to search form to Jackson apprising him of his rights. Jackson initially said that it wasn't necessary and that he trusted the police, but Captain Hinojosa insisted. And after Jackson was informed he had the right to refuse the search, he explained that he would only give police his consent to search his own bedroom within the apartment and nowhere else. He explained that because the apartment lease was in his grandmother's name and because the other bedroom was hers, he didn't think she would want them searching elsewhere.

After Jackson explained why he could not give his consent to search the rest of the apartment, Agent Oakes testified that he tried to get ahold of Lillie Banks, Jackson's grandmother. He testified that he went out into the hallway of the apartment building to make this phone call, and that is why he cannot be heard speaking on the phone with Ms. Banks on the audio recording. Agent Oakes's telephone records from that day show he made two phone calls to Lillie Banks' phone number at 8:57 a.m. and 9:17 a.m., and that he likewise received two calls from her phone number at 9:02 a.m. and 10:13 a.m. Agent Oakes testified that it was during the first phone call that he asked Lillie Banks if she would consent to the search of the apartment. He could not recall whether he told her she had the right to refuse consent. He recalled that Tajuana Banks answered the phone first before handing it to Lillie Banks. He testified that the conversation he had with her was not lengthy, but he was certain that Lillie Banks consented to the search

and that she did not revoke her consent during any of the subsequent phone calls.

Lillie Banks and Tajuana Banks testified differently from Special Agent Oakes. That said they only had two phone calls with police, and Lillie Banks testified that she did not give verbal consent over the phone to allow police to search her apartment. There is evidence that in some ways corroborates Agent Oakes's memory of his call with Banks. In the audio recording of Captain Hinojosa speaking with Jackson, at one point Agent Oakes can be heard saying that he had spoken with Lillie Banks and that she had agreed to a search of the entire apartment. Although this is a statement of Agent Oakes essentially corroborating himself, it is at least a contemporaneous recitation of the call.

Although the Government says police had full consent to begin searching the apartment at that time, they did not immediately do so while Jackson was still present. Instead, Captain Hinojosa then told Jackson that police wanted to speak with him further at the police station. Jackson asked when, and Captain Hinojosa said "now." Jackson testified that he did not feel the police asked so much as demanded that he accompany them. Jackson hesitated because he was the only person watching his five-year old cousin while Jackson's mother and grandmother were at the doctor's office. Police then agreed to try and contact them again to see if Jackson's cousin could be taken by police to the doctor's office, while Jackson went in another squad car to the Hammond Police Department. Jackson, who was wearing lounge clothes (it was before 9 a.m. when police showed up at his door) at the time, then asked police if he could

change before going to the station. And while the testimony on this issue was not consistent, it seems Jackson was told he could change in the bathroom (instead of his bedroom where police had been searching for Jackson's gun), and he testified that a police officer watched him change in his own bathroom. Captain Hinojosa testified that he allowed Jackson to change but that he personally did not observe him changing clothes. Jackson then travelled with Captain Hinojosa and Agent Oakes, and he was not handcuffed and rode in the front of the squad car to the station.

Around the time that officers left for the Hammond police station with Jackson, another squad car drove towards Westmont, Illinois, where Lillie Banks was having her doctor's appointment. Getting there took some time, and at 10:13 am, approximately an hour after Agent Oakes had first called Lillie and Tajuana Banks to ask if they could bring Jackson's cousin by, Tajuana Banks called Agent Oakes from Lillie Banks's cellphone to ask where they were. Agent Oakes informed them someone should arrive shortly, and they did. When officers arrived, they asked for use of a room in the doctor's office and officers questioned both Lillie Banks and Tajuana Banks briefly but separately.

During the questioning of Lillie Banks, a consent to search form was read to her, she signed it and agreed to the search of her apartment. She testified that the front of the form was too small for her to read (Ms. Banks is in her 70's) and thus the officer read it to her. She explained that she was a little nervous being questioned by police, but she confirmed that she was not threatened or coerced into signing the consent form. She

admits she signed it voluntarily and knew she was consenting to a search of her home. But she testified it was her impression that the search would not begin until she and her daughter arrived back at the apartment.

But the search of Lillie Banks' apartment began as soon as the two teams of law enforcement officers left (one to the Hammond police station with Jackson and the other towards Westmont, Illinois to deliver Jackson's cousin to his mother and grandmother). Thus, this written consent itself cannot be an independent basis for justifying the search of the apartment—it was obtained *after* the search was conducted, or at least after it was well under way.

The search of the apartment yielded physical evidence linking Jackson to the crime: more than $6,600 in cash, handwritten notes detailing aspects of the robbery, and a rudimentary diagram of the scene of the robbery. This evidence was found in different locations and in different rooms of the two-bedroom apartment, including the living room and Lillie Banks's bedroom.

Meanwhile, at the police station, Jackson was taken to a small conference-type room where his interrogation took place. On the audio recording of Jackson's trip to the police station with officers, he can be heard asking to use a restroom at the police station. Jackson testified that while he was never specifically told he couldn't go to the bathroom, no one ever followed up on his request and allowed him use of facilities at the police station. Nor did he make the request again. The audio recording eventually ends and from then on, the officers' interactions with Jackson were videotaped (with

audio) while Jackson was in the interrogation room. He was seated at a table, in a relatively small, but not cramped, windowless room. Officers, including Captain Hinojosa, Agent Oakes, and others came in and out of the room and for much of the time the door was left open. During the interrogation, these officers took different interrogation approaches with Jackson. Some were stern, while others were more conciliatory. There is no evidence or assertion that any physical force or threats of physical force, or threats of any nature were used against Jackson. Over the course of several hours, Jackson gave incriminating statements which implicated him in the robbery of the armored car.

The most important part of the interrogation for purposes on this motion, however, is what happened near the beginning of the interrogation. This occurred shortly after 10:30 a.m. At that time, Agent Oakes entered the interrogation room with a piece of paper. Jackson was seated at a table in the corner, and Agent Oakes sat down with Jackson and explained the form to him. It was a waiver of rights. Agent Oakes went line-by-line with Jackson, explaining to him the rights he had but which he could waive if he wanted to speak with police. This included Jackson's right to have an attorney present if he wanted one. After Agent Oakes read Jackson his *Miranda* rights and the waiver portion of the form, he asked Jackson if he understood. Jackson's immediate reaction was agreement that he understood. Jackson then began to sign, but he momentarily paused, asking "[s]o if I sign this I can talk to you?" Agent Oakes replied, "[y]eah" and Jackson confirmed with "ok, cool." He then signed the waiver.

Agent Oakes then further explained, "that's just saying you understand your rights and you're waiving your right to an attorney right now and you can talk to us." He did not re-read the entire waiver form or repeat to Jackson all of his *Miranda* rights a second time. Agent Oakes noted on the form that the time of signature was 10:40 a.m.

At the hearing, Jackson testified that, because this was his first real involvement with law enforcement, he was nervous and confused at the time he signed the waiver. But as can be seen on the video, Jackson never told Agent Oakes that he didn't understand his rights. Instead, quite the opposite, he confirmed to Agent Oakes that he understood the rights he was waiving, asked one follow-up question, and then continued to express his desire to talk. He proceeded to speak with law enforcement for several hours and never again tried to invoke his right to remain silent or ask for an attorney to be present. Instead, he made incriminating statements to police.

## Discussion

With the foregoing facts in mind, I will apply the applicable law to the facts and make specific factual findings to the extent the evidence supporting the above facts is in conflict. If the only issue before me was whether Jackson's consent to the search his bedroom was fully voluntary, it would be a close call. But I need not decide that issue because Lillie Banks gave a broader consent to search of the entire apartment, and the search did not occur until after Jackson voluntarily left the premises with the police. Because Jackson's grandmother gave her own independent, uncoerced, and voluntary consent to have her entire residence searched, the evidence seized may not be

suppressed as a matter of law. Likewise, the Government has met its burden to show that Jackson's waiver of his *Miranda* rights was made knowingly and voluntarily.

**A. Was Lillie Banks' Consent to a Search of Her Entire Residence Voluntary?**

Even though Jackson is the defendant and has argued that his consent to a search of a portion of his residence was obtained involuntarily (and thus in violation of the Fourth Amendment), I need not address this argument to decide the motion. Instead, I begin with Jackson's grandmother and co-tenant Lillie Banks. If Lillie Banks independently and voluntarily gave consent to the search of her entire apartment, then Jackson's consent as to the search of his bedroom doesn't really matter.

Let's start with the basics: "searches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. Cole*, 195 F.R.D. 627, 631 (N.D. Ind. 2000) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 748-49 (1984)). There was no warrant here, but one long-standing exception to the warrant requirement is an individual's voluntary consent to search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances" and no single factor controls. *Id.* at 227. "Relevant circumstances 'include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons." *Eidson v. Owens*, 515 F.3d 1139, 1146 (10th Cir. 2008)

(citation omitted). A person's age, intelligence, education, experience with law enforcement and language ability are all relevant to the equation. *United States. v. Raibley*, 243 F.3d 1069, 1075-76 (7th Cir. 2001).

"A third party with common authority over the premises sought to be searched may provide such consent.... Common authority is based upon mutual use of property by persons generally having joint access or control." *United States v. Aghedo,* 159 F.3d 308, 310 (7th Cir. 1998). That is the case even where one tenant may object to the search. *See United States v. Matlock*, 415 U.S. 164, 170 (1974) ("[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."). The Supreme Court has furthermore made clear that one co-tenant's consent to a search will trump any prior objection by another tenant once the objecting tenant has been removed from the property. *Fernandez v. California*, 571 U.S. 292, 305-306 (2014). And even if Jackson's consent was obtained invalidly (an issue I do not reach but may assume), if the consent obtained from Lillie Banks "was an act of free will independent" of Jackson's supposedly involuntary consent, the search would still be valid. *United States v. Parker*, 469 F.3d 1074, 1079 (7th Cir. 2006) (finding consent to search given by co-tenant valid where defendant had been detained even assuming the detention had been without probable cause and a result of official misconduct); *Brown v. Illinois*, 422 U.S. 590, 599 (1975).

When evidence is presented through live testimony, the district court is given

wide latitude to assess witness credibility and resolve inconsistencies between testimony. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1985). It is the Government's burden to show, by a preponderance of the evidence, that Lillie Banks's consent was voluntary. *United States v. Lechuga*, 925 F.2d 1035, 1041 (7th Cir. 1991).

As recounted above, Lillie Banks was generally absent from the scene of Jackson's encounter with police on the morning of June 27, 2018. She spoke briefly with two officers from her car as her daughter (Jackson's mother) drove her to a doctor's appointment in the western suburbs of Chicago. She was thus generally aware of what was going on. But from then on, she was not at the residence until the search had ended or was very near to ending. And she had telephone conversations with law enforcement during this time.

Lillie Banks testified, however, that while she spoke with law enforcement (she could not recall who exactly), she did not give verbal consent to a search of her apartment over the phone. Instead, she testified that she had two phone calls with a police officer, concerning arrangements for Jackson's cousin to be dropped off at her doctor's office once Jackson had agreed to go with officers to the Hammond police station for questioning. Her daughter, Tajuana Banks, testified similarly, that there were only two calls with officers, an incoming call in which an officer (Agent Oakes) asked if they could bring the child to the office, and then an outgoing call to Agent Oakes, approximately an hour later, when they were waiting at the doctor's office, but the police had yet to arrive.

Agent Oakes told a different story. He testified that during the first of the phone calls between the two of them, he asked for and obtained Lillie Banks's consent to a full search of her apartment. Agent Oakes's phone records corroborate his story. Specifically, the telephone records introduced by the Government show four phone calls between Agent Oakes and Lillie Banks, occurring at 8:57 am., 9:02 a.m., 9:17 a.m. and 10:13 a.m. The timing of these calls align with Agent Oakes's testimony in which he stated he called Lillie Banks, her daughter Tajuana answered the phone, but that he eventually spoke with Lillie Banks. During this first phone call, he says he asked Lillie Banks for consent to search. In the third conversation, he called her to ask her if officers could bring the child who had been present with Jackson in the home to the doctor's office where they were. And in the fourth phone call, Tajuana called Agent Oakes because nearly an hour had elapsed since they spoke and she wanted to know when officers were arriving with the child. No one testified as to what occurred during the second phone call, which was a call from Lillie Banks to Agent Oakes at 9:02 a.m.

I don't think Lillie or Tajuana are lying; I have no doubts as to their credibility or willingness to tell the truth where they know it, but in examining their testimony in full, there were several lapses in their memory of the events of June 27. This leads me to credit the contradicting testimony of Agent Oakes over that of Tajuana Banks and Lillie Banks on this issue. In particular, they were unable to fully recall or misstated Lillie Banks's appointment time, when phone calls were made, how long they were at the doctor's office, when they left or returned to the apartment, and where they were when

they had phone calls with law enforcement officers. None of this is surprising. Both Lillie and Tajuana Banks were occupied that day and focused on the doctor's appointment that they were running late for, and likely impacted by the sudden events and upsetting of their family that day. What's more and most simply, memories fade over time, especially those of a lay witness not in the habit of recording details.

Furthermore, while the search of the apartment had already begun by the time officers arrived at the doctor's office and spoke with Lillie Banks, she admits that she voluntarily signed a consent to search form when officers arrived at the doctor's office. She testified that nothing about her encounters with law enforcement were coercive. She did not ever once feel intimidated. And she admits that she freely signed the consent to search form that was presented to her at the doctor's office. And while the Government concedes that, given that the search had already commenced at the time Lillie Banks signed the consent to search, it itself cannot serve as a basis of an exception to the Fourth Amendment's warrant requirement, it is probative evidence nonetheless. Specifically, the later written consent makes it more likely that Banks verbally consented earlier.

In addition, I found Agent Oakes to be an entirely credible witness. As mentioned above, the contemporaneous audio recording of Jackson's interactions with police at the apartment corroborates Agent Oakes's version of events. He can be heard discussing that he had spoken with Lillie Banks, that she consented to the search, but that they would still get a written consent to search from her since officers were going

to drive the child to the doctor's office where she was. These statements were made shortly after Jackson consented to the police search of his room but informed officers that he could not consent to a search of the rest of the home. This contemporaneous statement that Lillie Banks had consented corroborates Agent Oakes's testimony. It strains credulity to think that Agent Oakes is not only lying about having spoken with Lillie Banks about consent to search over the phone, but also would have falsely stated that he had done so on an audio recording shortly after arriving at Jackson's home. This would require specific intent to manufacture Lillie Banks' consent on the spot and mention it on the audio recording to other officers to create a false record. Such a conspiracy is simply unsupported by the evidence. Agent Oakes did not use the consent he obtained from Lillie Banks over the telephone to pressure Jackson into expanding his own consent. One would assume that if the police were going to make up that Lillie Banks had consented to the search, they would have used that fact on Jackson.

On the objective factors specific to Lillie Banks's ability to provide consent, there is no evidence which makes me doubt her ability to give consent. While Ms. Banks was either 75 or 76 in June 2018, she was fully alert and responsive to police, both over the telephone and in person. Her somewhat advancing age is not an issue here. Indeed, in court she was very sharp, and she testified in a coherent way. She is a high-school graduate and retired school cafeteria worker. While her eye sight is not great, and she has other health problems, those seem to be physical in nature, and she was fully able to answer questions quickly and responsively throughout the hearing. I have no reason to

assume she did not do so on June 27, 2018. There is no indication, and there would have been no indication to police on the day in question, that Lillie Banks was unable to provide knowing consent to the search of her residence.

Accordingly, I find that Lillie Banks voluntarily consented to the search of her entire phone via telephone at approximately 9:00 a.m. on June 27, 2018. And while consent from absent co-tenants with authority over a residence seem somewhat rare, they do occur, and courts have given their assent to this type of consent. *United States v. Whyte*, 110 F. App'x 798, 799 (9th Cir. 2004) ("Ms. Whyte had common authority over her home, even though she had been moved to a nursing facility a little over a week before she gave consent to the search."). Nor are there facts akin to what could possibly make Jackson's consent involuntary (*i.e.*, seven armed law enforcement officers filing into a small apartment and restricting the movement of an individual within their own home) present as to Lillie Banks because she was not physically present at the apartment when she gave her consent.

Lastly, Jackson does not argue that Lillie Banks's telephone consent was coerced or is in any other way improperly obtained. Nor has he argued that Lillie Banks lacked authority to consent to a search of the entire apartment or otherwise invalid. Instead, he is arguing that based on Lillie Banks's testimony that she does not remember any such phone call, the consent never occurred. And while in *Fernandez*, discussed above, the police obtained consent of the co-tenant an hour after they had taken the defendant to the police station, *see* 571 U.S. at 296, I don't think the fact Jackson was still present in

the apartment when police obtained Lillie Banks's consent to search matters. Indeed, in *Fernandez*, the Court reiterated that "consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search" subject to the "narrow exception" announced in *Georgia v. Randolph*, 547 U.S. 103 (2006). *Fernandez*, 571 U.S. at 301. In *Randolph*, the Court held that a co-tenant's consent cannot trump "a physically present inhabitant's *express refusal of consent to a police search.*" *Randolph*, 547 U.S. at 122 (emphasis added). Here, Jackson's only objection to police searching more than his bedroom was that he did not think his grandmother would consent to the search. He indicated to police that it wasn't his call to make. In effect then, Jackson was not so much objecting to any search (indeed he acknowledges he signed the written consent after it was read to him and he was told he had a right to object), but he was instead telling officers that he lacked authority to consent to a search of the rest of the apartment which was leased in his grandmother's name. Jackson deferred to his grandma and thus bore the risk that she would consent to a full search of the apartment. Because I believe the Government has put forth enough evidence which establishes that the telephone conversation between Agent Oakes and Lillie Banks occurred, and that during that telephone call, Lillie Banks consented to the search of her apartment, Jackson's motion to suppress the physical evidence seized from his apartment will be denied.

### B.  Did Jackson Voluntarily and Knowingly Waive His *Miranda* Rights?

The second aspect of Jackson's motion to suppress is whether his statements to

police officers, made during his interrogation at the Hammond police station, should be suppressed. While Jackson does not deny that he signed a *Miranda* waiver form, he contests that his consent was obtained voluntarily and says that he signed it under a mistaken belief as to what he was agreeing to.

A valid *Miranda* waiver has two key components. First, rights like the right to remain silent and right to counsel must be waived voluntarily. That means that a waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the waiver must be made knowingly and intelligently. That means the "totality of the circumstances surrounding the interrogation must show that the defendant had a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Collins v. Gaetz*, 612 F.3d 574, 586–87 (7th Cir. 2010) (quoting *Burbine*, 475 U.S. at 421) (internal quotation marks omitted).

Considerations include, a defendant's age, level of education, the conditions of the interrogation, actions by the interrogating officials, as well as the defendant's prior experience with law enforcement, if any. *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009). In assessing whether a waiver occurred I must "indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404 (1977). To overcome the presumption against waiver, the Government must show that Jackson's decision to waive his rights was "the product of a free and deliberate choice...made with a full awareness of both the nature of the right being abandoned and the consequences of the

decision to abandon it." *Berghuis*, 560 U.S. at 382–83.

During the hearing, while Jackson testified that he did not fully comprehend what he was signing or what rights he was waiving, he did not indicate what in fact he thought the situation was. Nor during his interrogation (all of which was video recorded), did he express any clear indication that he didn't understand what Agent Oakes was reading to him. To the contrary, on the video Jackson confirmed he understood his rights as Agent Oakes read them to him. When Jackson expressed some hesitation, Agent Oakes further elaborated as to the effect of Jackson signing the waiver. And while he did not repeat the full *Miranda* warning or re-list every right Jackson had and was waiving; such a re-recitation was not required under the circumstances.

Indeed, Agent Oakes went above what the Constitution mandates when he fully read Jackson his rights. "[T]he rigidity of *Miranda* does not extend to the precise formulation of the warnings given a criminal defendant...[and] no talismanic incantation is required to satisfy its strictures." *Duckworth v. Eagan*, 492 U.S. 195, 202–03 (1989) (citations omitted). There was no obligation to re-read those same warnings after Jackson expressed some minor trepidation. Agent Oakes answered his question, and Jackson finished signing and began speaking with police. "The law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385.

Jackson is high school graduate and was 29 at the time of his interrogation. He

displayed no signs of diminished capacity or intelligence. It was mid-morning when he agreed to the waiver of his rights. The interrogation began only moments before, and Jackson had only been at the police station for approximately 10 minutes. Throughout the interrogation he had access to his cell phone, at least until he gave police consent to search it and he executed a second consent to search form as to his cell phone. He was provided with multiple beverages. And at one point an officer left to get him food from McDonald's, although it seems Jackson was placed under arrest before he got his food. All these facts suggest a fully uncoercive atmosphere during the interrogation.

Jackson also makes an argument that his will to consent to questioning and waive his rights was overborne by law enforcement's threats. [DE 24 at 9-10.] But there is nothing in the video recording or in any of the testimony which would suggest intimidation or threats rising to a constitutional violation. Of course, at times some of the interrogators used a more forceful tone, but they were never seen to be yelling or screaming. Stern interrogation by police does not a constitutional violation make. There was no physical force, no withholding of sleep, food, or water or extended bathroom deprivation. No threats of physical force against Jackson or threats against his family. Those type of things are the hallmark of an interrogation which runs afoul of the Constitution. And none were present here.

While it is true that on the audio recording of the drive to the police station, Jackson can be heard to ask to use a restroom and the Government concedes he did not use the bathroom prior to the interrogation, that fact alone cannot overcome the facts

weighing on the other side. Jackson did not make another request to use the bathroom, and the waiver occurred in a matter of minutes not hours after Jackson arrived at the station. Any coercive effect from the apparent bathroom deprivation seems minimal, at most.

Jackson made it apparent to law enforcement that he understood what was happening and what rights he was giving up by agreeing to speak with police. While he expressed some confusion and asked one question as he was signing, his response of "ok, cool" also made clear he understood what he was signing. In the end, the video recording makes clear that this was a fairly run-of-the-mill police interview and interrogation. Nothing about it could be said to be coercive enough to be a constitutional violation.

## Conclusion

For the foregoing reasons, Defendant Akeem Jackson's Motion to Suppress [DE 24] is DENIED.

SO ORDERED on May 20, 2019.


/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT