UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cr-86-PPS |
| | ) | |
| AKEEM JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## OPINION AND ORDER

On September 9, 2019, Defendant Akeem Jackson pleaded guilty to one count of Hobbs Act robbery and one count of possession of a firearm in furtherance of that robbery. [DE 53.] On January 3, 2020, I sentenced him to a term of 87 months imprisonment to be followed by a three-year term of supervised release. [DE 65.] Jackson seeks a modification of his sentence [DE 69], which is effectively a request for a compassionate release so that Jackson may serve the remainder of his sentence in home confinement. The Government opposes the request, and on June 9, 2020, I held an evidentiary hearing in which I heard evidence by way of testimony from Mr. Jackson and proffers from both Jackson's attorney and the Government. [DE 81.] The parties both then made supplemental submissions. [DE 82, 83.] After due consideration, and for the reasons discussed below, I will grant Jackson's motion (although the formal grant will be held in abeyance for at least 14 days), order him released from prison, and place him under home confinement as a term of his supervised release.

-1-

## Background

On April 18, 2018, Jackson participated in a brazen robbery of a Brinks armored truck outside of a bank in broad daylight. Jackson previously worked for Brinks and was thus familiar with its operations. The driver of the armored car was servicing an ATM outside the bank when Jackson, and at least two others, got out of their car and ordered the driver to the ground. Jackson took the drivers gun from him, and it is that gun that formed the basis for the weapons charge in this case. He then entered the armored vehicle to retrieve cash and place it in the robbers' car, while one of the accomplices kept a gun trained on the driver. More than $600,000 was stolen as a result, and the robbers fled the scene.

In June 2018, working off a hunch and acting without an arrest or search warrant, investigators searched Jackson's residence with his consent. They recovered evidence of his involvement in the robbery, including hand drawn maps, notes about divisions of money, and approximately $6,000 in cash. Jackson then voluntarily went in for questioning, admitted to his involvement in the robbery, and was arrested.[1] He was then subsequently charged in a two-count indictment, and on September 9, 2019, Jackson pled guilty without the benefit of a plea agreement. [DE 53.] During the plea hearing and again at sentencing, he admitted under oath to his involvement in the crime.

Jackson claimed to be a reluctant, but ultimately willing, participant in the

---

[1] Jackson later moved to suppress his confession and the evidence found in his residence. On May 20, 2019, I denied the motion. [DE 47.]

robbery. He stated that individuals in his neighborhood knew he had worked for Brinks and had approached him multiple times before about assisting in some sort of robbery. He further said that he finally agreed to participate after one of those individuals threatened to physically harm his immediate family, including his mother, grandmother, fiancé, and children. In a letter submitted in connection with his sentencing, Jackson said that prior to agreeing to participate in the robbery, the other robbers showed Jackson photos of him and his mother walking to her car, photos of his fiancé and daughter at the park, and photos of his grandmother. [DE 63-3.] Jackson also says that they told him they would kill members of his family "one by one" if he went to the police. [*Id.*] In any event, Jackson agreed to commit the robbery and then did.

At sentencing, I tended to believe Jackson's claims as to his role in the offense. Prior to this episode, Jackson didn't have so much as a parking ticket on his record – no prior juvenile adjudications, no adult convictions, no other pending criminal charges, and not even any prior arrests. [DE 60, PSR at ¶¶ 45-51. What's more, Jackson appeared to be a very docile individual. I fully recognize that making this type of assessment is somewhat a game of guesswork. Nonetheless, that was my clear impression of Mr. Jackson. In trying to make sense of how someone with no criminal history, and who presented in a docile manner, could commit an armed robbery, Jackson's story about the coercion rang true to me, and I said as much at the sentencing hearing.

I sentenced Jackson to a term of 87-months on January 3, 2020; I gave him 27-months for the Hobbs Act robbery charge and the mandatory minimum of 60-months, consecutive, for the firearm charge. [DE 65.] Prior to sentencing, Jackson had been

detained without bond, and so he has been in custody since June 2018, or roughly 24 months.

Jackson is relatively a young man (aged 31), has most of his sentence still to serve, and is at present, not diagnosed with any terminal illness. Thus, in normal circumstances, his motion would be unlikely to have much traction. But these are not normal circumstances. The novel corona virus disease of 2019, known as COVID-19, has become a pandemic which has figuratively turned the world upside down. The toll COVID-19 is taking is especially evident in our nation's prisons, jails, and correctional institutions. And it is even more evident with regard to the institution in which Jackson is serving his sentence: the Federal Correctional Institution Elkton, located in Lisbon, Ohio. FCI Elkton has been one of the hardest hit institutions in the country. As of the date of the evidentiary hearing on this motion, out of approximately 2500 inmates at Elkton, 438 had tested positive for COVID-19. That's roughly 25% of the entire prison population. FCI Elkton had the third highest number of inmates who have tested positive for the virus and second highest number of inmate deaths (nine) in the entire federal prison system. *See* COVID-19 Cases, Federal Bureau of Prisons (last viewed June 10, 2020) www.bop.gov/coronavirus. Those numbers do not include the 162 inmates or 46 staff members at FCI Elkton who had recovered from the virus as of the date of the hearing. *Id.* And while it is true that these numbers change daily, and the numbers may have improved by now, the spread of COVID-19 remains a very big problem at FCI Elkton.

Matters are so bad at FCI Elkton that the institution is the subject of a class action

lawsuit pending in the Northern District of Ohio. *See Wilson v. Williams*, 4:20-cv-794-JG, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020). In that case, the court issued a preliminary injunction requiring Elkton officials to evaluate (or re-evaluate) every member of a subclass of medically vulnerable inmates within two weeks for "eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough." *Id.* at *10. In doing so, it stated that "despite their efforts, the Elkton officials fight a losing battle. A losing battle for staff. A losing battle for inmates." *Id.* at *1. And indeed, Jackson was included within that subclass of medically vulnerable inmates and received a second evaluation from the Warden. But the Warden again denied Jackson's request for compassionate release.

Regardless, on June 9, 2020, the United States Court of Appeals for the Sixth Circuit vacated the district court's injunction, finding that the inmates failed to show a likelihood of success on the merits of their claims of their Eight Amendment claims against FCI Elkton. *See* DE 54-2, *Wilson v. Williams*, No. 20-3447 (6th Cir. 2020) (Slip Op. at 2). Thus, while the *Wilson* class action and the now-vacated preliminary injunction will not provide an avenue for Jackson to be transferred out of FCI Elkton (at least not now), that does not resolve Jackson's individual petition before me which was filed separate and apart from that class action.

So back to the specifics of this case. At present, Jackson has not tested positive for COVID-19, however, he testified that he has not been tested for the virus for several weeks. He further testified that despite the fact he is in a dormitory at FCI Elkton for

inmates who have not contracted COVID-19, multiple inmates who initially tested negative were in fact positive and have since been transferred out of the unit. Thus, it seems that at least for some period, Jackson and other inmates were housed in the same, open, dormitory-style unit as individuals who were unknowingly infected with COVID-19. Jackson further testified that social distancing is a practical impossibility within the dormitory because three individuals reside and sleep in one cubicle-type "cell" within a few feet of one another, and inmates congregate in the same common areas, for example, to watch TV. It stands to reason then, that there would be additional inmates who have contracted, but have not been tested for, COVID-19. But without additional testing, it's not yet known what that number is.

  Furthermore, Jackson's medical history contains conditions which he says put him at a high risk for having complications in the event he contracts COVID-19. He testified that he is 5'6" tall and weighs 293 pounds. That translates to a Body Mass Index (BMI) of roughly 47, which puts Jackson above the >40 BMI threshold for morbid obesity. Furthermore, while in custody prior to being sentenced, Jackson was diagnosed with high blood pressure/hypertension. However, as of March 4, 2020, the last date on which Jackson saw a medical professional at FCI Elkton, his blood pressure appeared to be under control. As such, he ceased taking medication for it. Jackson also has a history of respiratory illness in the form of chronic bronchitis which Jackson was first diagnosed with at the age of eight. He testified that he had bronchitis episodes requiring emergency medical care in 2017, prior to his arrest, and also in 2018 while he was a pretrial detainee in the Porter County Jail. At his hearing, he testified that within

the dormitory at Elkton FCI he feels he is frequently short of breath and using a mask (provided by the facility to help reduce the spread of COVID-19) has made breathing more difficult at times. He testified that he will frequently try to move away from other inmates and remove his mask to catch his breath throughout the day.

Prior to filing his motion, Jackson sought administrative relief from the Warden at FCI Elkton. That was on April 6, 2020. [DE 69-1.] On April 27, 2020, the Warden denied the request for compassionate release. [DE 69-2.] Then, in light of the injunction in the *Wilson* case, as noted above, Jackson was reevaluated for transfer or home confinement and that relief was denied a second time (although the parties did not submit a written record of that denial). Consequently, the motion for compassionate release is now before me and ripe for resolution.

## Discussion

It must be recognized out the outset and emphasized that compassionate release is "an extraordinary and rare event." *United States v. Mangarella*, 3:06-cr-151-FDW-DCK-3, 2020 WL 1291835, at *2-3 (W.D.N.C. Mar. 16, 2020). When I impose a sentence, my intent is for it to be served as given. But obviously there are exceptions to that, and a well-founded request for compassionate release is one of them. Compassionate release is governed by 18 U.S.C. § 3582, which was recently amended by the First Step Act of 2018. The statute contains two general requirements: (1) an exhaustion requirement, by which individual inmates must first seek relief from the Bureau of Prisons or the Warden at their institution; and (2) a substantive requirement, which contains numerous elements that I must consider prior to granting compassionate release. The

fundamental substantive requirement is that a defendant must show "extraordinary and compelling reasons" for compassionate release.

So, first, the exhaustion issue. I can consider a motion from an inmate only after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). As detailed above, Jackson has met the exhaustion requirement by seeking compassionate release from the Warden at FCI Elkton. The Warden denied Jackson's request on April 27, 2020 and thereafter, Jackson's motion was filed on May 10, 2020. [DE 69.]

Now it is on to the meat of the matter, whether "extraordinary and compelling reasons" warrant compassionate release "after consideration of the factors set forth in section 3553(a) to the extent they are applicable" as well as any pertinent policy statements from the U.S. Sentencing Commission. *See* 18 U.S.C. § 3582(c)(1)(A)(i). In other words, I must answer three (at times related) questions: (1) whether a reduction is consistent with the factors listed in section 3553(a); (2) whether extraordinary and compelling reasons warrant a sentence reduction; and (3) whether a reduction would be consistent with the Sentencing Commission's policy statements? The Section 3553(a) factors include (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant; and (3) the kinds of sentences and sentencing range for

the applicable category of offense committed. 18 U.S.C. § 3553(a).

I'll start with the Section 3553(a) factors, the same factors I considered when imposing Jackson's sentence. The Sentencing Guideline recommendation for Jackson was a sentence of 101 to 111 months, a range of 41-51 months on the Hobbs Act robbery charge, and then a mandatory minimum of 60 months, to be served consecutively, for the firearm charge. In considering the remaining Section 3553(A) factors, I deviated from that recommendation and sentenced him below the guidelines to a prison term of 87 months. That is because, despite the nature of the crime Jackson committed, it was clear that he had accepted responsibility for his actions and the robbery was an aberration within the larger context of his life. He is a high-school graduate, who has attended some college, has held steady jobs and seems devoted to his family. This was his first run-in with the law.

In his colloquy and letter in connection with his sentencing, Jackson told me about how he came about committing the crime in question. He wasn't a member of a street gang or a career criminal, petty or otherwise. Instead, he says he was targeted by other criminals who knew of his past employment with Brinks. And when Jackson did not previously agree to help them, they pressured him into doing so (and pressured him into not going to the police) by threatening to harm and even kill multiple members of his immediate and extended family.

Furthermore, of the more than $600,000 stolen from the Brinks truck in the robbery, Jackson said he received roughly $10,000. That story and that amount is generally consistent with the fact that when his residence was searched a few months

after the robbery, officers found $6,000 cash and not a larger sum. The remainder of the stolen cash has yet to be recovered and no one else has been arrested. All of that strongly suggests, to me, that as Jackson testified, he was a reluctant participant and acted, at least in part, to protect his family rather than solely out of monetary again.

At bottom, Jackson says he was a patsy, acting under duress—or at least extreme reluctance—when he committed the robbery. As I said at the outset, I tend believe him. That obviously doesn't excuse his conduct, but it informed the sentence and informs my decision here. In addition to confessing to his involvement in the crime, Jackson attempted to cooperate with the authorities by providing them the name of one of the individuals involved in the crime, as well as street names of others who he did not know personally. Yet the Government did not move at sentencing for a United States Sentencing Guidelines (USSG) Section 5K1.1 or Section 3553(e) departure from the otherwise applicable range or mandatory minimum. Law enforcement does not seem to have made any additional arrests in the case nor have additional charges been brought as a result, so the usefulness of Jackson's information is not yet known. But the investigation is still ongoing. Furthermore, while the 87-month sentence in federal prison was below the guidelines, it wasn't a slap on the wrist by any means. It accurately reflected the seriousness of the crime while also recognizing that Jackson no prior criminal record. In my judgment, Jackson poses a very low risk of engaging in criminal behavior in the future. He strikes me as a good person who messed up once, big time.

That said, Jackson has only served about 24 months of his 87-month sentence.

This represents only a little more than a quarter of his total sentence but is nearly all of the sentence related to the Hobbs Act robbery count. The remainder of Jackson's sentence was for using or carrying a firearm in connection with the robbery which has mandatory minimum sentence of 60 months. *See* 18 U.S.C. § 924(c). There is thus little possibility of simply reducing Jackson's sentence, and he has not sought that. Instead, he asks that I place him immediately on supervised release and add a condition that he serve a term of home confinement. In addition, as part of his sentence, Jackson agreed to pay restitution in the amount of $100 a month, that of course remains unchanged by the outcome of his request for compassionate release. Thus, while there are things which weigh on both ends of the scale, overall, granting some form of compassionate release is consistent with Section 3553 given Jackson's prior lack of criminal history, strong family and community ties, and unlikely odds of recidivism.

Next I must address whether there are "extraordinary and compelling reasons [that] warrant such a reduction" and whether "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The pertinent policy statement is set forth in USSG § 1B1.13. But as other courts have noted, this policy statement has not been updated since the passage of the First Step Act of 2018, and thus, the policy statement is applicable to a more restrictive compassionate release regime than what is presently the law. *Brant*, 2020 WL 2850034, at *4; *United States v. Redd*, 2020 WL 1249493, at *6 (E.D. Va. Mar. 16, 2020) ("[T]here does not currently exist, for purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'"). All that is to say, while the Sentencing

-11-

Commission's policy statement provides specific examples of what may be extraordinary and compelling circumstances, the list is not exhaustive and it not stretch of the imagination to conclude that "the COVID-19 pandemic, paired with a medical condition known to exacerbate the risk of substantial injury or death, is an extraordinary and compelling factor which may be considered." *United States v. Brant*, 2:18-cr-20155-TGB-MKM, 2020 WL 2850034, at *5 (E.D. Mich. Jun. 2, 2020); *see also Miller v. United States*, No. 16-20222, 2020 1814084, at *3 ("Miller has presented 'Other Reasons' in combination with his serious medical conditions, to warrant compassionate release.").

Furthermore, setting aside the uncertain nature of the class action proceedings at issue in *Wilson*, I think the status of COVID-19 at FCI Elkton remains extremely concerning. "While the Court does not doubt the BOP's efforts to stop the growing spread of the infection throughout FCI Elkton … whatever FCI Elkton is doing, events are conspiring so that it is not working." *Brant*, 2020 WL 2850034, at *2. Several other courts addressing motions for compassionate release from inmates at FCI Elkton have come to similar conclusions. *See, e.g. United States v. Rodrigues*, No. 2:03-CR-271-AB-1, 2020 WL, 1627331, at *9 (E.D. Pa. Apr. 1, 2020) ("The situation at FCI Elkton in particular is alarming … Elkton is filled to capacity and appears to have few tests."); *United States v. Bass*, 1:10-CR-166 (LEK), 2020 WL 2831851, at *1 (N.D. New York. May 27, 2020) ("FCI Elkton has endured an outbreak of COVID-19 that has been exacerbated by features of the prison's internal architecture that inhibit social distancing."). But of course, the presence of COVID-19 at a prison, even in a rampant form like at FCI Elkton, does not

-12-

by itself create extraordinary and compelling reasons. There must be more, tied to the specific inmate's medical risk profile.

Jackson's specific case is a close call on the medical question, but I think he falls on the side of sufficiently showing he is at an increased risk of contracting a fatal case of COVID-19. There aren't a lot of medical records from FCI Elkton available, as Jackson was only sentenced a few months ago. But the parties proffered facts on these issues and are in general agreement as to Jackson's health.

First, Jackson suffers from hypertension, which has been recognized by the CDC as a condition which puts an individual at higher risk from having serious harm from or dying from COVID-19. "People Who Are at Higher Risk for Severe Illness" (June 11, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (hereafter "CDC Advisory on Higher Risk Individuals"). Although because that condition is presently under control and Jackson is not taking medication for hypertension, it does not really tip the scales one way or the other. Other courts have also ruled that controlled hypertension does not offer a basis to grant compassion release from a prison with a COVID-19 outbreak. *See, e.g.*, *United States v. Pinkley*, No. 05-cr-30104, 2020 WL 2200433, at *3 (C.D. Ill. May 6, 2020) (denying motion for compassionate release where defendant's hypertension was well controlled).

Second, Jackson is morbidly obese (defined as a BMI of >40), which also puts him at a higher risk for severe complications if he were to contract COVID-19. *See* CDC Advisory on Higher Risk Individuals. At the hearing on this motion, Jackson testified that he is 5'6" tall and weighs 293 pounds. These metrics are well above the level

defining morbid obesity. So, this condition also favors granting Jackson's motion because of the likely effect contracting COVID-19 would have on him because of it.

Third, and most concerning to me under the circumstances, is Jackson's history of bronchitis. He testified that he had to go to the emergency room in 2017 because of his chronic bronchitis. He likewise had an episode in 2018 and testified that the issue stems from a diagnosis in this childhood. Respiratory illnesses, such as asthma and chronic bronchitis, are also recognized as increasing the risks associated with contracting COVID-19. *See* CDC Advisory on Higher Risk Individuals. During the hearing, Jackson testified that he has been using an inhaler while at FCI Elkton, but that it has since run out. He further testified that he has sought a refill of his inhaler from the prison doctor but has not received anything. He testified that wearing a mask within his unit has made it difficult for him to breathe as well, resulting in him having to remove the mask to catch his breath. This history of respiratory illness likewise weighs in favor of granting Jackson's motion.

In sum, Jackson's medical risk factors, combined with the continued and widespread presence of COVID-19 in FCI Elkton, creates a circumstance that is extraordinary and compelling. Given what has happened and continues to happen at FCI Elkton because of its open, dormitory-style in which social distancing is improbable to impossible, this situation is distinguishable from cases where a high-risk inmate is in a prison without a COVID-19 outbreak. *Cf. United States v. Fry*, No. 11-1414 (PAM/KMM), 2020 WL 1923218, at *1 (D. Minn. Apr. 21, 2020) (denying compassionate release for 66-year old obese man with heart disease and hypertension where there

were no documented cases of COVID-19 at the facility in which defendant was incarcerated); *United States v. Eberhart*, No. 13-cr-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13."). At present, there is a disconcerting probability that Jackson will contract the virus if he remains at FCI Elkton. If he does contract it, his medical profile suggests there could be dire consequences. I sentenced Jackson to 87 months in prison, I did not sentence him to contract and potentially die from a deadly virus in prison.

ACCORDINGLY: For the foregoing reasons, the Court GRANTS Defendant Akeem Jackson's Motion to Modify Sentence [DE 69], but will hold the relief in abeyance for a period of 14 days so that proper precautions can be taken in order to safely effectuate Jackson's release from prison.

The Warden at FCI Elkton is ORDERED to place Jackson in quarantine and isolation for a period of 14-days prior to release. Jackson should be monitored for symptoms and tested for COVID-19 during that time. The Government has indicated that it will update the Court as to any changes in Jackson's condition and it is ORDERED to do so.

Furthermore, during the pendency of that isolation, U.S. Probation and Pretrial Services is ORDERED to determine the suitability of Jackson's family residence for supervised release and home confinement. Jackson's counsel is ORDERED to promptly

provide the address of Jackson's family to U.S. Probation and Pretrial Services.

At the conclusion of the 14-day period of isolation, if Jackson remains negative for COVID-19 and is not otherwise exhibiting symptoms, and the proposed residence is deemed suitable for home confinement, consistent with 18 U.S.C. § 3582(c)(1)(A), Jackson's sentence of imprisonment will automatically be reduced to time served. His three-year term of supervised release will begin immediately with an additional condition that he be placed on home confinement. All other terms of supervision announced at Jackson's sentencing will remain in place.

SO ORDERED on June 19, 2020.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT